FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: May 11 2023

KEVIN P. WEIMER , Clerk

By: s/Kari Butler
Deputy Clerk

(USAO GAN 6/10)  Search Warrant

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

A Cellular Phone Seized During the Arrest of Jeremy Newman

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**
Case number: 4:23-MC-39

I, Jeffrey Maddox, depose and say under penalty of perjury:

I am an Inspector of the U.S. Postal Service and have reason to believe that in the property described as:

A Cellular Phone Seized During the Arrest of Jeremy Newman, as further described in Attachment A, which is attached hereto and incorporated herein by reference,

in the Northern District of Georgia there is now concealed certain information and certain data, namely,

See Attachment B, which is attached hereto and incorporated herein by reference,

which constitutes evidence of a crime and property designed for use, intended for use, or used in committing a crime, concerning violations of Title 21, United States Code, Section(s) 841 and 846 and Title 18, United States Code, Section(s) 1512. The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT

Continued on attached sheet made a part hereof.

Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1.

Signature of Affiant

Jeffrey Maddox

May 11, 2023
Date

Rome, Georgia
City and State

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

AUSA Calvin A. Leipold, III

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Jeffrey A. Maddox, Postal Inspector of the U.S. Postal Inspection Service (USPIS) Atlanta, Georgia, depose and say under penalty of perjury:

### INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession as further described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2.      As a United States Postal Inspector, I am an investigative law enforcement officer of the United States of America within the meaning of Title 18, United States Code, Section 2510(7). I am empowered by law to conduct investigations of, and to make arrests for, offenses related to the U.S. Postal Service (hereinafter "USPS") and the mails, as authorized by Title 18, United States Code, Section 3061.

3.      I have been employed by the USPIS since August of 2017, and currently assigned to Atlanta Division Headquarters. I am a sworn Federal law enforcement officer empowered to investigate criminal activity involving or relating to the U.S. Postal Service (USPS) and/or U.S. Mail. I am currently assigned to the contraband interdiction and investigations team, which investigates the mailing of illegal narcotics, dangerous drugs, and their proceeds. I have received training in the detection and investigation of prohibited mailing offenses.

4.      I have received training in the detection and investigation of prohibited mailing

2

offenses during a residential Basic Inspector Training program in Potomac, Maryland. I have also received training in financial investigations as they relate to drug trafficking organizations, money laundering, and asset forfeiture. I have received field training and participated in many aspects of USPIS drug investigations, including but not limited to, parcel interdiction, surveillance, controlled deliveries, execution of search warrants, interview and interrogation, confidential source/cooperating witness debriefing, and interception and analysis of electronic communications. I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations. I am familiar with drug traffickers' methods of operation, especially as they relate to the USPS, including the storage, transportation, and distribution of drugs, the transfer and collection of money which represents the proceeds of drug trafficking, and money laundering.

5.      I know based on my training and experience in previous drug investigations that drug traffickers often use any means available to them to transport narcotics. One common method of smuggling drugs is to ship narcotics via the U.S. Mails. In addition, I know that drug traffickers commonly maintain books, records, receipts, notes, ledgers, financial information, electronic data, and other items relating to the importation, transportation, ordering, purchasing, and distribution of illegal drugs in their electronic devices and electronic data storage devices, such as cellular telephones. This evidence is helpful not only to establish the nature of the criminal enterprise, but also to show the co-conspirators state of mind.

6.      I know based on my training and experience in previous drug investigations that individuals involved in the distribution of controlled substances will often use cellular telephones, tablets, and other communication devices to maintain contact with drug

associates, drug sources of supply, and drug customers. I know that drug traffickers will often take "trophy" pictures of drugs, money, firearms, and other items associated with their illegal activities. I know that drug traffickers will often communicate via email or other electronic messaging to one another to facilitate the distribution of controlled substances. I know that individuals using the U.S. Mails for the purpose of transporting controlled substances will often make inquiries on their electronic devices via the Internet or customer service telephone lines to track the delivery status of these parcels. Drug traffickers furthermore sometimes make searches using internet search browsers and access web pages relating to their drug trafficking scheme or otherwise showing their state of mind. Furthermore, I know based on my training and experience that this data often remains in the device in some form even if an individual later attempts to delete it.

7.     I know based on my training and experience in previous drug investigations that drug traffickers keep records, ledgers, logs, pictures, and other documentation of their criminal activity readily accessible in their cellular telephone either as a means to facilitate their crime or to demonstrate their skill in conducting a criminal enterprise. This documentation often includes information relating to the types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions. Additionally, based on my training and experience, I have seen drug traffickers take and save screenshots of online parcel tracking information on their cellular telephone for later use in conjunction with the criminal enterprise. This documentation also often includes information related to the criminal enterprise such as names, addresses, telephone numbers, bank records where traffickers store or launder the proceeds of their criminal enterprise, other identifying information of co-conspirators, sources of drug supply, and drug customers, names of co-

4

conspirators, as well as shipment, tracking, and delivery information for packages containing illegal controlled substances.

8.      I know based on my training and experience in previous drug investigations that drug traffickers often utilize other individuals, sometimes known as, among other slang, "mules," for certain tasks pertaining to their drug trafficking activity, such as receiving drug parcels and transporting drug parcels on their behalf, in order to attempt to insulate themselves from any connection to the drugs. I know based on my training and experience that drug traffickers often compensate these "mules" with currency.

9.      I know based on my training and experience in previous drug investigations that drug traffickers often utilize multiple cellular telephones for multiple different parties, such as sources of supply, "mules," distributors, and customers. Drug traffickers attempt to compartmentalize their activities and electronic communications to separate devices in order to insulate the various parties from each other and thwart law enforcement attempts to map out the drug trafficking conspiracy.

<u>IDENTIFICATION OF THE DEVICE TO BE EXAMINED</u>

10.      Through the application for search warrant and this affidavit in support, I seek authorization to search the following property – Apple iPhone 14 Pro Max further referenced to as the SUBJECT DEVICE:

11.      The SUBJECT DEVICE was seized by law enforcement officers during a arrest on May 2, 2023, and is more particularly described in Attachment A. The SUBJECT DEVICE is currently secured at the US Postal Inspection Service Atlanta Division Headquarters located at 200 Tradeport Boulevard in Atlanta, located within the Northern

District of Georgia. The requested warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

## FACTS AND CIRCUMSTANCES REGARDING PROBABLE CAUSE

12.     This affidavit is based upon my personal knowledge, training, and experience, and other information developed during the course of this investigation. This affidavit is also based upon information and experience imparted to me by other law enforcement officers. Because this affidavit is being submitted for the limited purpose of establishing probable cause and securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846,  and Title 18, United States Code, Section 1512 have been committed, and that evidence relating to those offenses likely can be found within the SUBJECT DEVICE.

### Synopsis

13.     The United States Postal Inspection Service (USPIS) Atlanta Division is investigating criminal activity between JEREMY NEWMAN and ONESEPHIORUS LADAWN GRISSETTE. On July 26th, 2022, USPIS received a tip from the Chickamauga Post Office regarding a parcel containing fentanyl that was destined for 303 Lee and Gordon Mill Rd Chickamauga, GA 30707. Inspectors intercepted the parcel from the Chickamauga Post Office for further investigation and obtained a federal search warrant through the Northern District of Georgia. The contents of the parcel contained 6 grams of blue circular pills which field tested positive for fentanyl. A controlled delivery of the parcel was conducted on July 28th, 2022 with the assistance of Walker County Drug Task Force. A male

6

later identified as JERMEY NEWMAN arrived at the Chickamauga Post Office where he took possession of the parcel and was taken into custody.

14.     During a subsequent post-*Miranda* interview, NEWMAN admitted to purchasing the pills from "LADAWN GRISSETTE". LADAWN GRISSETTE would later be identified as ONESEPHIORUS LADAWN GRISSETTE. NEWMAN also stated that another parcel was enroute as he made another purchase from GRISSETTE after the first parcel did not arrive on time.

15.     NEWMAN provided written consent for agents to review the contents and communication history in his phone. While examining NEWMAN's cell phone, agents noted numerous Cash App payments to "$onyx39" that also showed the screen name "Ladawn Grissette". Based on records received from Cash App, the Cash App payments go as far back as October 2020 and continued through July 27, 2022.

16.     During the course of the interview, NEWMAN stated that he was introduced to GRISSETTE through a mutual friend as a source to buy illegal narcotics. NEWMAN stated that they were first introduced through Facebook and exchanged telephone numbers to facilitate the purchase of illegal narcotics. Agents examined NEWMAN's phone contacts and located a "Ladawn Grissette" with 843-504-4781 as the associated phone number. Agents confirmed that this was the number that NEWMAN contacted GRISSETTE at when he wanted to purchase illegal narcotics.

17.     Further research of USPS records indicated that NEWMAN had received approximately sixty-six (66) suspected narcotics parcels from Conway, South Carolina all bearing the same characteristics such as shipment type, payment type, and weight.

18.     Agents researched GRISSETTE through law enforcement databases and located a ONESEPHORIOUS LADAWN GRISSETTE residing in Conway, South Carolina. Conway is also the location of the Post Office that the seized parcel was shipped from.

19.     On August 1, 2022, agents intercepted the parcel referenced during NEWMAN'S post arrest interview inbound from Conway, South Carolina destined for NEWMAN's residence bearing tracking number EI396698173US. A search warrant was secured through the Northern District of Georgia to examine the contents of the parcel. Upon execution, the parcel was found to contain approximately 16.7 grams of blue circular pills stamped "A215" that field tested positive for the presence of fentanyl.

20.     On August 9, 2022, a subpoena for the 843-504-4781 phone number was served, and the records received from the phone company identified the account holder as ONESEPHORIOUS LADAWN GRISSETTE.

21.     On August 16, 2022, agents requested information through USPS business records regarding the payment method for the parcels seized from Conway, South Carolina. Agents received a credit card number which was subpoenaed and identified the credit card account holder to be ONESEPHORIOUS LADAWN GRISSETTE.

22.     On December 9, 2022, agents received records from Cash App indicating NEWMAN had paid GRISSETTE $85,695.00 historically. Per NEWMAN, those payments would have been for the shipment of narcotics from GRISSETTE to NEWMAN.

23.     On April 11, 2023, the Northern District of Georgia Grand Jury indicted NEWMAN and GRISSETTE on Conspiracy to Distribute Controlled Substance in violation of Title 21, United States Code, Sections 846 and 841(a)(1) as well as a substantive distribution count.

24.     On April 24, 2023, GRISSETTE was taken into custody during a traffic stop at 1601 11th Avenue, Conway, South Carolina 29526. GRISSETTE was headed to a court appearance on a separate state drug charge. In a post arrest interview, GRISSETTE was read his Miranda rights and agreed to speak with agents.

25.     GRISSETTE admitted to shipping pills to NEWMAN on numerous occasions. GRISSETTE corroborated the accounts provided by NEWMAN in a prior interview regarding how they were introduced and later established communication via phone to facilitate drug transactions. GRISSETTE's phone was seized and is pending a forensic examination.

26.     On May 1, 2023, I received information that NEWMAN's aunt, DENISSE MARION, believed NEWMAN was attempting to conspire with family members to tell the courts that the narcotics found during the previous arrest in July 2022 by Walker County Drug Task Force was not NEWMAN's but MARION's narcotics.

27.     On May 2, 2023, Postal Inspectors and Task Force Officers with the assistance of the local drug task force contacted NEWMAN and arranged for him to meet at 1342 Lafayette Road, Rossville, Georgia 307421. At approximately 12:00 PM, NEWMAN arrived to the address driving a silver Chevrolet Impala. NEWMAN was subsequently asked to exit the vehicle and was taken into custody. NEWMAN requested that a member of his family be contacted to come retrieve his vehicle and dog that was in the vehicle. NEWMAN advised that the SUBJECT TELEPHONE was in the passenger seat and requested agents to retrieve it so he could call a relative. Agents retrieved the SUBJECT TELEPHONE and allowed him to call a relative. The relative was unable to come to retrieve the vehicle. Agents impounded the vehicle and arranged for animal control to take custody of NEWMAN's dog. At this time, agents seized the SUBJECT TELEPHONE and transported it to USPIS Atlanta.

9

28.     On May 5, 2023, I interviewed NEWMAN's aunt, DENISSE MARION, regarding the allegation that he was conspiring with family members.  MARION stated that she was contacted by her daughter, TENITA, who stated that NEWMAN had reached out via a text messaging service. MARION stated that NEWMAN was attempting to have TENITA go to court with him and testify that TENITA saw MARION "plant" the pills that he was charged with.

29.     I reviewed screen shots of the messages that MARION referred to. The first screen shot was a message from TENITA to MARION that stated, "Jeremy Newman asked me to go to court with him and lie about you and say that I seen you plant those drugs in his house. Just letting you know what he is up to so you don't get a surprise". The second screen shot was of the message from NEWMAN to TENITA. The screen shot featured the name "Jeremy Newman" under a profile picture of the same dog that agents encountered when taking NEWMAN into custody. The message was sent on March 6, 2023 at 7:39 PM. The message from NEWMAN stated the following, "You should come to court with me May 1 and say you were here and seeing your mom plant them pills on my" a second message followed with "My lawyers in the process of pulling out the paperwork details. Exactly why I got raided" "Plz". TENITA declined to assist NEWMAN in a following message. I attempted to contact TENTIA but have been unable to interview her at this time. I believe that these messages are an attempt to obstruct justice in violation of 18 U.S.C. § 1512.

30.     Upon further investigation of the SUBJECT TELEPHONE, agents noted that it appears to be an Apple iPhone 14 Pro Max. The SUBJECT TELEPHONE lacks identifiers such as serial numbers and/or IMEI numbers printed on the exterior of the phone as was common with older Apple iPhone models. In addition, the sim card tray that was once accessible from

the exterior of the phone that aided in identifying the phone was removed as well. The SUBJECT TELEPHONE is believed to be an Apple iPhone 14 Pro Max based on physical characteristics of the device.

31.    Additionally, I know based on my training and experience, that users of Apple iPhones, such as the SUBJECT DEVICE can transfer the contents of prior phones onto new phones. This content can include messages, photos, and video – which can constitute evidence of the use of the prior device that is now located on a new device. Therefore, based on NEWMAN's long- term narcotics trafficking and messages indicating that he is actively attempting to tamper with the ongoing criminal investigation, I believe that there is probable cause to search the SUBJECT DEVICE from October 1, 2020 to May 2, 2023.

## **TECHNICAL TERMS**

32.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and from the telephone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and telephone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This

removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least three satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include

13

various types of flash memory cards or miniature hard drives. This removable

storage media can store any digital data. Most PDAs run computer software,

giving them many of the same capabilities as personal computers. For example,

PDA users can work with word-processing documents, spreadsheets, and

presentations. PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique

numeric address used by computers on the Internet. An IP address is a series of

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).

Every computer attached to the Internet computer must be assigned an IP address

so that Internet traffic sent from and directed to that computer may be directed

properly from its source to its destination. Most Internet service providers control

a range of IP addresses. Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP

addresses.

g.  Internet: The Internet is a global network of computers and other electronic

devices that communicate with each other. Due to the structure of the Internet,

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

33.    Based on my training, experience, and research, and from consulting the

manufacturer's advertisements and product technical specifications available online, I know

that the SUBJECT DEVICE has the capabilities that allow it to serve as a wireless telephone,

14

digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer are evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

37.   *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

16

## **CONCLUSION**

38.    I submit that this affidavit supports probable cause for search warrants authorizing the examination of the SUBJECT DEVICE described in Attachment A to seek the items described in Attachment B, based on suspected violations of Title 21, United States Code, Sections 841(a)(1) and 846 from at least October 1, 2020 until the time of NEWMAN's arrest on May 2, 2023.

**ATTACHMENT A**

The property to be searched consists of one cellular telephone seized by law enforcement officers during an arrest on May 2, 2023, more particularly described as:

- SUBJECT DEVICE 1: Apple iPhone 14 Pro Max seized on May 2, 2023 during the arrest of Jeremy Newman.

The cellular telephone, referred to as the SUBJECT DEVICE, is currently secured at the United States Postal Inspection Service Atlanta Division Headquarters located at 200 Tradeport Boulevard - Suite 209 in Atlanta, Georgia.

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

1. **ATTACHMENT B**

    Upon completion of the forensic examination described in Attachment A, the following particular items are subject to seizure by the government:

    1.    All records, data, and files stored on the SUBJECT DEVICE, as described in Attachment A, that relate to violations of Title 21, United States Code, Sections 841 and 846, and Title 18 United States Code, Section 1512, which occurred between October 1, 2020 and April 24, 2023, including, but not limited to:

    a.   Lists of customers and related identifying information;

    b.   Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.   Any information related to sources of drugs (including names, addresses, telephone numbers, or any other identifying information);

    d.   Any information regarding calendar, schedule or travel information;

    e.   All bank records, checks, credit card bills, account information, and other financial records;

    f.   Telephone number of the particular SUBJECT DEVICE and other identifying information for the SUBJECT DEVICE including ESN, IMSI, and IMEI;

    g.   Incoming and outgoing call data;

    h.   Dates and times of telephone calls;

    i.   Address book information (contact names and associated telephone numbers, photographs, addresses, and e-mail addresses)

    j.   Missed, received, and dialed calls;

k.  Text message log and text message content stored on the SUBJECT DEVICE pertaining to drug possession and trafficking including but not limited to prices, amounts, sizes, names, code, transportation, location, directions, and other methods and means of distribution;

l.  Stored images and/or videos, and e-mails pertaining to drug possession and trafficking including but not limited to prices, amounts, sizes, names, code, transportation, location, directions, and other methods and means of distribution;

m.  Records of user attribution showing who used or owned the SUBJECT DEVICE at the time the data was created, edited, or deleted, such as logs, telephone books, unsaved usernames and passwords, documents, and browsing history;

n.  Internet history including tracking information for packages shipped via the United States Postal Service and other shipping carriers;

o.  Records of wire transfers and other money transfers including dates, times, amounts, and locations;

p.  Records and data that indicate the SUBJECT DEVICE locations including but not limited to metadata contained on images, internet history, apps, and text messages;

q.  Records of Internet Protocol addresses used; and

r.  Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.